**643**

Wolfgang BAENITZ, and Chemische Werke Witten, Plaintiffs,

v.

David L. LADD, Commissioner of Patents, Defendant.

Civ. A. No. 1651–63.

United States District Court
District of Columbia.

Jan. 4, 1965.

As Amended Jan. 28, 1965.

------◆------

Paul M. Craig, Jr., Dicke & Craig, Washington, D. C., for plaintiffs.

Clarence W. Moore, Sol., U. S. Patent Office, Washington, D. C., for defendant.

JACKSON, District Judge.

This is an action pursuant to 35 U.S.C. § 145, seeking a judgment of this Court authorizing the defendant, Commissioner of Patents, to issue Letters Patent of the United States to the plaintiffs containing claims 25 to 30 of an application for patent, Serial No. 792,706, filed February 12, 1959, entitled "Production of Fats."

The invention described in the application relates to a process for producing hard and brittle fats, suitable for food and pharmaceutical purposes, by esterifying a saturated fatty acid having between 10 and 18 carbon atoms per molecule, such as stearic acid, or a mixture of such acids, with an excess of glycerine in the presence of an esterification catalyst. The excess of glycerine is used to control the melting point of the resultant product. The application points out that the melting point depends upon the amount of excess glycerine used, and specifies the proportion of glycerine to be that amount which produces an ester product having a hydroxyl value of between 40 and 100.

Claim 25 is a representative claim, and reads as follows:

"A method for controlling the melting point of hard and brittle fats within a relatively narrow desired range during the manufacture thereof by esterification of a fatty acid selected from the group consisting of saturated fatty acids having about 10 to 18 carbon atoms per molecule and mixtures thereof with an excess of glycerol to produce an ester mixture having a hydroxyl number between about 40 and 100, comprising the step of controlling the melting point of the ester mixture produced by said esterification by selecting the quantity of said excess glycerol."

The Patent Office Board of Appeals denied these claims on the ground that the difference between their subject matter and the prior art would have been obvious to one having ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. To show this obviousness, the Board relied upon United States patents to Christensen (No. 2,022,494, granted November 26, 1935), Kuhrt (No. 2,634,278, granted April 7, 1953), and Feuge et al. (No. 2,745,749, granted May 15, 1956).

The Christensen patent discloses a process for producing edible fats by esterifying 120 parts by weight of glycerine with from 300 to 600 parts by weight of stearic acid in the presence of a catalyst. Christensen points out that a product containing 93% monostearin is obtained by using 300 parts by weight of stearic acid, and that a product "consisting mostly of distearin" can be

obtained by using 600 parts by weight of stearic acid. He states, further, that "* * * various mixtures of mono and distearin can be prepared by varying the quantity of stearic acid used, in other words by varying the ratio of glycerine to higher fatty acids." The patent shows that 300 parts by weight of stearic acid is the quantity necessary to esterify one of the hydroxyl groups of glycerine, and that 600 parts by weight of stearic acid is the quantity necessary to esterify two of the hydroxyl groups of glycerine.

The Feuge et al. patent describes a process for modifying the melting point and · like properties of monostearin by directly acylating a portion of the hydroxyl groups of monostearin. The process comprises acylating monostearin with 0.5, 1.0 and 2.0 moles of acetic anhydride per hydroxyl equivalent of monostearin to obtain various mixtures of monostearin and acetylated monostearin. Feuge et al. show that the amount of acetic anhydride used determines the hydroxyl value of the mixtures produced and controls the melting point of the mixtures.

The Kuhrt patent discloses the direct esterification of fatty material, such as stearic acid, with an excess of glycerine to produce ester mixtures containing a maximum amount of monoglyceride or a maximum amount of diglyceride. Kuhrt recognizes that a partial ester product will be in dynamic equilibrium with glycerine and the fatty reactant, and that a change in the relative amounts of glycerine and fatty reactant will change the character of the product. To carry out the esterification as a cyclic process without reversion of the product, Kuhrt separates the partial ester from the reaction mixture by a rapid vacuum distillation. ·

At trial, the Patent Office introduced three additional publications.

The first was a textbook entitled "Physical Chemistry for Colleges", by E. B. Millard, First Edition, published in 1921, which disclosed on pages 93–94 that the melting point of a substance is lowered by the presence of some other substance in proportion to the quantity of it present.

The second, another textbook, "Melting and Solidification of Fats", by Alton E. Bailey, published in 1950, contained on page 48 the following statement:

"It is well known that the melting point of a substance is usually lowered by the admixture of a small proportion of any second substance, even if the latter is relatively high melting."

The third was an article entitled "Industrial Oil and Fat Products", by Alton E. Bailey, published in 1945, which on page 48 defined "hydroxyl number" as follows:

"* * * The *hydroxyl number* is the number of milligrams of potassium hydroxide equivalent to the hydroxyl content of one gram of fat." (Emphasis quoted).

The theory of the Patent Office was that either the Christensen disclosure or the Kuhrt disclosure, when viewed with the Feuge et al. patent in mind, would have made it obvious to a person skilled in the art to arrive at the subject matter of plaintiffs' claims.

The plaintiffs made three principal assertions: first, that Christensen did not specify the hydroxyl number for his products, or state that he sought to directly control their melting point; second, that Kuhrt did not suggest plaintiffs' method for directly controlling the melting point of the product, and third, that Feuge et al. was concerned with products having properties entirely different from the properties of the products obtained by plaintiffs.

The Patent Office responded by observing, first, that Christensen, through the use of the process and ingredients he disclosed, would *inherently* arrive at plaintiffs' results. Second, the Patent Office stated that although Kuhrt did not mention melting points, he did show that it was old to produce partial ester mixtures (containing various amounts of monostearin or distearin) by esterifying directly an excess of glycerine with stear-

ic acid. Third, the Patent Office pointed out that the importance of the Feuge et al. patent resided in its disclosure that through varying the relative amounts of monostearin and acetic anhydride used in the direct acylation of monostearin, the melting point of the ester produced could thereby be controlled. Finally, the Patent Office relied upon the publications introduced at trial to show the amount of novelty involved in controlling the melting point of mixtures through proportionate variation of their ingredients.

After examining the evidence as a whole, the Court is inclined to agree with the defendant's interpretation of the references. The testimony demonstrated that the amount of glycerine used in the plaintiffs' process ranges from 131 to 168 grams per 1000 grams of stearic acid, and that this clearly overlaps the Christensen range of 160 to 320 grams per 1000 grams, assuming that 80% crude glycerine was used in the reaction. Further, it was shown that the hydroxyl numbers of esters obtained from use of 160 to 168 parts of glycerine would be in the range from 90 to 100. It was also pointed out that the temperature at which the Christensen process is conducted is the same as that for the plaintiffs' process. From this, it appears that the processes of Christensen and the plaintiffs are essentially the same. Accordingly, it seems reasonable to suppose they would inherently produce the same result. At least, the Court cannot say such a view is unwarranted where plaintiffs have offered no convincing proof to the contrary.

On the question of controlling the melting point, it is clear, first, that if Christensen's process inherently produces plaintiffs' result, then the feature of controlling the melting point would necessarily be included in such a process. Whether this advantage in fact occurred to Christensen appears somewhat doubtful. It is clear, however, from the other references, that varying the proportion of ingredients in mixtures such as Christensen's was, at the time of the invention, known to vary the mixture's melting point. This was shown by the various textual publications introduced by the defendant at trial, and also by the patent to Feuge et al. In view of this, the Court cannot say the Patent Office was clearly wrong in finding that control of the melting point as claimed by plaintiffs, would have been obvious to a person skilled in the art having all these disclosures before him.

Since the Court agrees with the Patent Office rejection on the above discussed theory, it does not find it necessary to reach the rejection based upon the Kuhrt disclosure.

The Court finds for the defendant, and against the plaintiff, and will dismiss the Complaint.

The above Opinion contains Findings of Fact and Conclusions of Law.